Daniel J. Quigley
(State Bar No. 011052)
DANIEL J. QUIGLEY, PLC
5425 E. Broadway Blvd., Ste. 352
Tucson, Arizona 85711
(520) 867-4430
quigley@djqplc.com

*Attorney for Plaintiffs Massie and Schulzke*

*Additional counsel in signature block*

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF ARIZONA

| | |
|---|---|
| Rebekah Massie; and Quintus Schulzke, | No:    2:24-cv-02276-ROS--DMF |
| *Plaintiffs*, | **PLAINTIFF SCHULZKE'S MOTION FOR A PRELIMINARY INJUNCTION ON CLAIMS 1–3 AND MEMORANDUM OF LAW** |
| v. | |
| City of Surprise, *et al.*, | |
| *Defendants*. | ORAL ARGUMENT REQUESTED |

Plaintiff Quintus Schulzke moves under Federal Rule of Civil Procedure 65 for a preliminary injunction against Defendant City of Surprise preventing it from enforcing its policy broadly prohibiting the public from voicing "complaints" about city officials during open public comments at City Council meetings. This motion is supported by the Complaint, the following Memorandum of Law, and the accompanying declaration. Plaintiff Schulzke respectfully requests that the Court schedule an expedited hearing.

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ................................................................................... 3

Surprise's Council Criticism Policy bars "complaints" about officials, but permits praise. ............................................................................. 3

Mayor Hall uses police to enforce the Council Criticism Policy and pledges to eject those who "attack" city employees "in the future." ......................... 4

Schulzke, a frequent participant in City Council meetings, intends to criticize city officials at City Council meetings. .......................................... 5

ARGUMENT ....................................................................................................... 5

I.   Schulzke Has Standing to Challenge the Council Criticism Policy. ............ 6

II.  Schulzke is Likely to Succeed on the Merits that Surprise's Council Criticism Policy Violates the First Amendment. ........................................... 6

A.   The Council Criticism Policy violates the First Amendment by discriminating based on viewpoint and content. ................................... 7

1.   The Council Criticism Policy is viewpoint discriminatory. .......................................................................... 7

2.   The Council Criticism Policy is also unconstitutional content discrimination. ................................. 9

B.   The Council Criticism Policy is unconstitutionally overbroad. ........................................................................................ 11

C.   The Council Criticism Policy is void for vagueness. ....................... 12

III.  Schulzke's Loss of First Amendment Rights is Irreparable Harm. ............ 14

IV.  The Balance of Harms and Public Interest in Freedom of Expression Favor a Preliminary Injunction. ................................................................... 15

CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

## Cases

*Acosta v. City of Cosa Mesa,*
 718 F.3d 800 (9th Cir. 2013) ................................................................. 9

*Am. Beverage Ass'n v. City and Cnty. of San Francisco,*
 916 F.3d 749 (9th Cir. 2019) ................................................................. 6

*Baca v. Moreno Valley Unified Sch. Dist.,*
 936 F. Supp. 719 (C.D. Cal. 1996) ........................................... 3, 8, 9, 11

*Barrett v. Walker Cnty. Sch. Dist.,*
 872 F.3d 1209 (11th Cir. 2017) ............................................................. 6

*Baumgartner v. United States,*
 322 U.S. 665 (1944) .............................................................................. 1

*City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp. Rel. Comm'n,*
 429 U.S. 167 (1976) ............................................................................ 10

*Connick v. Myers,*
 461 U.S. 138 (1983) ............................................................................ 12

*Cornelius v. NAACP Legal Def. & Educ. Fund,*
 473 U.S. 788 (1985) ............................................................................ 10

*Daniels-Hall v. Nat'l Educ. Ass'n,*
 629 F.3d 992 (9th Cir. 2010) ................................................................. 3

*DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,*
 196 F.3d 958 (9th Cir. 1999) ............................................................... 10

*Elrod v. Burns,*
 427 U.S. 347 (1976) ............................................................................ 14

*FCC v. Fox Television Stations, Inc.,*
 567 U.S. 239 (2012) ...................................................................... 12, 13

*Hill v. Colorado,*
 530 U.S. 703 (2000) ............................................................................ 12

*Hopper v. City of Pasco,*
 241 F.3d 1067 (9th Cir. 2001) ............................................................... 9

*Iancu v. Brunetti,*
        588 U.S. 388 (2019) .................................................................................. 8

*Johnson v. Couturier,*
        572 F.3d 1067 (9th Cir. 2009) ............................................................... 15

*Lozman v. Riviera Beach,*
        585 U.S. 87 (2018) ..................................................................................... 1

*Marshall v. Amuso,*
        571 F. Supp. 3d 412 (E.D. Pa. 2021) ..................................................... 13

*Massachusetts v. Oakes,*
        491 U.S. 576 (1989) ................................................................................. 11

*Meinecke v. City of Seattle,*
        99 F. 4th 514 (9th Cir. 2024) ........................................................... 14, 15

*Minn. Voters All. v. Mansky,*
        585 U.S. 1 (2018) .............................................................................. 13, 14

*Moody v. NetChoice, LLC,*
        144 S. Ct. 2383 (2024) ............................................................................ 11

*Nken v. Holder,*
        556 U.S. 418 (2009) ................................................................................. 15

*Norse v. City of Santa Cruz,*
        629 F.3d 966 (9th Cir. 2010) ........................................................ 2, 7, 11

*Reed v. Town of Gilbert,*
        576 U.S. 155 (2015) ............................................................................ 9, 10

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
        515 U.S. 819 (1995) ................................................................................... 8

*Rosenblatt v. Baer,*
        383 U.S. 75 (1966) .............................................................................. 6, 12

*Snyder v. Phelps,*
        562 U.S. 443 (2011) ................................................................................. 12

*United States v. Playboy Ent. Grp., Inc.,*
        529 U.S. 803 (2000) ................................................................................. 10

*United States v. Stevens,*
    559 U.S. 460 (2010) ............................................................................. 11

*Weaver v. City of Montebello,*
    370 F.Supp.3d 1130 (C.D. Cal. 2019) ................................................ 15

*White v. City of Norwalk,*
    900 F.2d 1421 (9th Cir. 1990) ......................................................... 2, 7

*Widmar v. Vincent,*
    454 U.S. 263 (1981) ........................................................................... 10

## **Statutes**

Ariz. Rev. Stat.
    § 38-431.01(I) ................................................................................ 3, 10

## **Rules**

Fed. R. Civ. P. 65 ....................................................................................... 15

## **INTRODUCTION**

The City of Surprise and Mayor Skip Hall hold City Council meetings at which residents are allowed to publicly comment on any matter—but cannot criticize city employees or officials. On August 20, 2024, Mayor Hall enforced this city policy by directing police to detain Plaintiff Rebekah Massie for questioning the city attorney's salary—then pledged that "any time" people "attack any staff member" or city official, now "and in the future," they will be "escorted out."

Surprise's censorship has no place in a free society. Our Constitution's guarantee, enshrined in the First Amendment, is that everyone—including Plaintiffs Massie and Schulzke, who frequently attend Surprise City Council meetings—enjoy "the right to criticize public men and measures" as "one of the prerogatives of American citizenship." *Baumgartner v. United States*, 322 U.S. 665, 673–74 (1944). As the Supreme Court has explained, public comments at local government meetings are "high in the hierarchy of First Amendment values" because the "right to petition [i]s one of the most precious of the liberties safeguarded by the Bill of Rights." *Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018) (internal quotation omitted).

Video of the August 20 City Council meeting speaks for itself. (Declaration of Quintus Schulzke ("Decl. Schulzke"), ¶ 6; Compl. Ex. A.) During the meeting's public comment portion, Massie criticized a pay increase for Surprise's city attorney. Mayor Hall wasn't having it. Enforcing an unconstitutional decorum rule (the "Council Criticism

—1—

Policy") against "complain[ing] against any employee of the City,"[1] Mayor Hall interrupted Massie, ordering her to stop. After she explained that the First Amendment protects her remarks, Mayor Hall ordered the on-duty police officer to detain Massie (in front of her 10-year-old daughter) and eject her from the meeting. Now, Plaintiff Quintus Schulzke—who saw the video of Massie's arrest and Mayor Hall's pledge to similarly enforce the policy moving forward—reasonably fears that if he criticizes city officials in City Council meetings (as he frequently does), he will similarly be ejected, detained, or arrested.

Surprise's Council Criticism Policy violates the First Amendment. "Citizens have an enormous first amendment interest in directing speech about public issues" to their city council. *White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990). Therefore—as the Ninth Circuit has made clear—city councils may eject speakers only "for *actually* disturbing or impeding a meeting," and not simply for speech that officials dislike. *Norse v. City of Santa Cruz*, 629 F.3d 966, 976 (9th Cir. 2010) (emphasis added).

Criticizing government officials during a public city council comment period is not "disturbing or impeding" the meeting. It is democracy and self-government in action. The Court should enjoin the Council Criticism Policy and restore the First Amendment to Surprise's City Council meetings. *See, e.g.*, *Baca v. Moreno Valley Unified Sch. Dist.*, 936

---

[1] The formal policy provides: "Oral communications during the City Council meeting may not be used to lodge charges or complaints against any employee of the City or members of the body …" Surprise, Ariz. Rules for the Public at Council Meetings at 2(e) (last amended Aug. 1, 2023). (Decl. Schulzke, ¶ 9; Compl. Ex. C at p. 20.)

F. Supp. 719 (C.D. Cal. 1996) (applying *Norwalk* to preliminarily enjoin public comment rule banning "complaints against any employee").

## STATEMENT OF FACTS

***Surprise's Council Criticism Policy bars "complaints" about officials, but permits praise.***

The City of Surprise invites members of the public to share views on municipal affairs during "Call to the Public" segments of City Council meetings. (Decl. Schulzke, ¶ 4); *see also* Ariz. Rev. Stat. § 38-431.01(I) (public bodies "may make an open call to the public" so any individual may "address the public body on any issue within" its jurisdiction). The City claims it "values the comments" and provides a "Council Meeting Public Comment Form" to facilitate input. (Decl. Schulzke, ¶ 7; Compl. Ex. B.) One of the "rules" for public comments prohibits voicing "complaints" about public servants:

> Oral communications during the City Council meeting may not be used to lodge charges or complaints against any employee of the City or members of the body, regardless of whether such person is identified in the presentation by name or by any other reference that tends to identify him/her. Any such charges or complaints should be submitted during normal business hours to the City Manager for appropriate action. (*Id.*)

Public praise is not barred by rule or in practice. For example, members of the public have praised the City's police chief ("If there is ever any issues, I trust in Chief Piña to do what is necessary"),[2] lauded the Parks and Recreation director (giving "her and her staff a

---

[2] Video of the Apr. 18, 2023, meeting of the Surprise City Council is available at https://bit.ly/surprisepraise1. This exchange occurs at 13:42. The Court can take judicial notice of City Council videos because they are information made publicly available by the City of Surprise. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).

standing ovation"),[3] and even handed a Councilmember a gift after extoling him for his support of the arts.[4]

***Mayor Hall uses police to enforce the Council Criticism Policy and pledges to eject those who "attack" city employees "in the future."***

Plaintiff Rebekah Massie attended the August 20, 2024, City Council meeting with her 10-year-old daughter. After Mayor Skip Hall recognized Massie to speak during the "Call to the Public," she objected to a pay raise for the city attorney, which had been proposed on grounds that he had "faithfully and competently performed" his duties. (Decl. Schulzke ¶ 6; Compl. Ex. A at 1:57:56.)[5] Massie opined that the city attorney's salary was already high compared to other municipalities, that he had not competently handled a mayoral candidate's violations of city policy, and that his responses to public-records requests had been slow. (*Id.* at 1:59:00.)

Mayor Hall interrupted Massie, held up a copy of the Public Comment Form, and read aloud the Council Criticism Policy, telling Massie, "this is your warning . . . for attacking the city attorney personally." (*Id.* at 2:00:30.) When Massie explained she had a right to present "factual information," Hall responded that the fact she was presenting factual information "doesn't matter," telling her to "stop talking" or "be escorted out." (*Id.* at 2:01:06.)

---

[3] Video of the Oct. 17, 2023, meeting is available at https://bit.ly/surprisepraise2. This exchange occurs at 39:33.

[4] Video of the Dec. 20, 2022, meeting is available at https://bit.ly/surprisepraise3. This exchange occurs at 34:30.

[5] Video of the August 20, 2024, meeting is available at https://bit.ly/massiesurprise. Mayor Hall recognizes Massie at 1:57:42.

Mayor Hall pledged that "in the future also, any time you attack any staff member" or official, speakers will be "escorted out." (*Id.* at 2:01:51.) At Mayor Hall's direction, a police officer detained Massie and placed her under arrest, leaving her 10-year-old daughter behind. (*Id.* at 2:02:14.)

***Schulzke, a frequent participant in City Council meetings, intends to criticize city officials at City Council meetings.***

Plaintiff Quintus Schulzke, a resident of Surprise, frequently attends and speaks at the twice-monthly City Council meetings. (Decl. Schulzke, ¶ 4–5, 11–13.) Schulzke founded the Voice of Surprise, a political organization "[d]edicated to fostering transparency and accountability among our city's leaders[.]" (*Id.* ¶¶ 14–15; Compl. Ex. E.) Schulzke often addresses (and criticizes) the council's zoning decisions and commission appointments.

Schulzke wants to continue criticizing city policies, proposals, and officials at City Council meetings. (*Id.* ¶ 17–20.) However, having watched the video of the City Council meeting in which Mayor Hall ejected Massie and pledged to continue ejecting speakers— at the hands of city police—Schulzke must make an impossible choice: risk ejection (or worse) or censor his remarks to avoid the Council Criticism Policy. (*Id.* ¶ 16–20.)

## ARGUMENT

Schulzke is entitled to a preliminary injunction against Surprise's Council Criticism Policy. He has standing to challenge the policy and shows below that: (i) the Council Criticism Policy is unconstitutional; (ii) he will suffer irreparable First Amendment harm at future City Council meetings if the rule is not enjoined; (iii) the balance of equities favors

relief because his interest in exercising his freedom of speech outweighs Surprise's interest in enforcing an unconstitutional policy; and (iv) the public interest always favors protecting First Amendment rights. *Am. Beverage Ass'n v. City and Cnty. of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (setting out factors for and issuing preliminary injunction against an ordinance which violated the First Amendment).[6]

## I.   Schulzke Has Standing to Challenge the Council Criticism Policy.

Schulzke has standing to challenge the Council Criticism Policy as a frequent participant during public comment periods who wishes to criticize Surprise officials at future meetings, but reasonably fears the policy's enforcement. That places him in the bullseye of the policy and confers standing. *See, e.g.*, *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1220–21 (11th Cir. 2017) (finding standing to challenge a public comment restriction where plaintiff had spoken at past meetings and wished to speak at future meetings).

## II.   Schulzke is Likely to Succeed on the Merits that Surprise's Council Criticism Policy Violates the First Amendment.

A preliminary injunction is warranted because Surprise's rule banning "complain[ing]" about public officials violates the First Amendment. And "criticism of government is at the very center of the constitutionally protected area of free discussion." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). Governments cannot demand praise as a condition of being heard, nor may they enforce silence at the sound of dissent.

---

[6] This motion is brought only by Schulzke. The trespassing charges against Massie arising from Mayor Hall's enforcement of the policy remain pending.

The public comment period of a City Council meeting is a limited public forum. *Norse*, 629 F.3d at 975; *see also White*, 900 F.2d 1421, 1425 (9th Cir. 1990) (holding same). So "[l]imitations on speech at city council meetings must be reasonable and viewpoint neutral" and "enforced that way." *Norse*, 629 F.3d at 975 (cleaned up). The Ninth Circuit is clear that regulations must be limited to preventing "*actual* disruption" of a meeting. *Id.* at 976 (emphasis added).

Schulzke is likely to succeed on Claims 1–3 because the policy violates the First Amendment in three independent ways. First, the Council Criticism Policy is viewpoint- and content-discriminatory on its face, allowing praise of officials while prohibiting complaints. Second, the policy is overbroad, sweeping far beyond *actual* disruption to ensnare a significant amount of speech on matters of public concern absent any disruption. Third, the policy is unconstitutionally vague, inviting arbitrary and discriminatory enforcement of the policy by allowing criticism of the city's actions to be construed as criticism of the people who carry it out. For any of these reasons, a preliminary injunction is warranted.

### A.   The Council Criticism Policy violates the First Amendment by discriminating based on viewpoint and content.

#### 1.   The Council Criticism Policy is viewpoint discriminatory.

The Council Criticism Policy violates the First Amendment by permitting laudatory and neutral speech about officials but prohibiting "complaints" about them. That means it is viewpoint-discriminatory on its face. Viewpoint discrimination is an "egregious form of content discrimination" because it targets "not subject matter, but particular views taken

by speakers on a subject," *Iancu v. Brunetti*, 588 U.S. 388, 417 (2019) (cleaned up), and suppresses speech "otherwise within the forum's limitations" based on the speaker's "opinion or perspective." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 830 (1995).

The court in *Baca v. Moreno Valley* enjoined a functionally identical policy because it was viewpoint-discriminatory, barring criticism but allowing positive or neutral speech about employees. 936 F. Supp. at 725. A comparison of *Baca*'s school board policy with the Council Criticism Policy illustrates that they are nearly indistinguishable:[7]

| *Baca* Public Comment Rule | Surprise Council Criticism Policy |
|---|---|
| "No oral or written presentation in open session shall include charges or complaints against any employee of the District, regardless of whether or not the employee is identified by name or by any reference which tends to identify the employee." *Id.* | "Oral communications during the City Council meeting may not be used to lodge charges or complaints against any employee of the City or members of the body, regardless of whether such person is identified in the presentation by name or by any other reference that tends to identify him/her." |

And as in Surprise, the *Baca* officials weaponized the rule to stamp out criticism and intimidate critics. During a board meeting, a mother complained that officials had not addressed "numerous complaints brought to them by parents." *Id.* at 726. Like Mayor Hall, the presiding officer wielded the policy as a cudgel against dissent. He interrupted the mother and ordered her to stop complaining about employees. *Id.* After the mother

---

[7] Surprise's policy is distinguishable only in that it is broader. *Baca*'s policy was limited to complaints about employees, but Surprise's policy reaches employees and "members of this body"—that is, its elected officials.

continued, the presiding officer had her "physically removed" by a sheriff's deputy, all, like here, for peacefully expressing her views on matters of public concern. *Id.*

The *Baca* court preliminarily enjoined the policy, explaining that "when the state creates a limited public forum it properly may limit the subject matter to be discussed," but "not … the views which may be expressed on that subject." *Id.* at 725, 730. The court opined it was "difficult to imagine" a policy that so starkly discriminated based on viewpoint, because the policy "allows expression of two points of view (laudatory and neutral) while prohibiting a different point of view (negatively critical) on . . . employees' conduct or performance." *Id.*

Surprise's policy is also unconstitutionally viewpoint discriminatory, barring criticism of public officials and employees but allowing adulation. *See Acosta v. City of Cosa Mesa*, 718 F.3d 800, 816 (9th Cir. 2013) (holding a rule against "personal, impertinent, profane, insolent, or slanderous remarks" violated the First Amendment).

### 2. *The Council Criticism Policy is also unconstitutional content discrimination.*

The Council Criticism Policy also violates the First Amendment by restricting speech based on content in prohibiting a particular subject matter: criticism of government officials. *See Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015) (content discrimination occurs when a speech regulation "target[s]" a "specific subject matter"). Content discrimination is permissible in a limited public forum only if, in addition to being viewpoint neutral, it is "reasonable in light of the purpose served by the forum." *Hopper v. City of Pasco*, 241 F.3d 1067, 1075 (9th Cir. 2001) (quoting *DiLoreto v. Downey Unified*

*Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 (9th Cir. 1999)); *see also Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 809 (1985).

The Council Criticism Policy is not reasonable in light of the purpose of a public comment period. Arizona statute establishes that the purpose of a call to the public is to allow the public to "address the public body on *any issue* within [its] jurisdiction." Ariz. Rev. Stat. § 38-431.01(I) (emphasis added). Arizona law, moreover, explicitly contemplates criticism as part of the "open call to the public," because "members of the public body" have a statutory right to "respond to criticism made" during public comments. *Id.* The purpose of a public comment period is hearing from the public, not a government ego boost.

Conversely, "reasonable" content discrimination means, for example, that a school board might prohibit speakers from complaining about the power company—it does not mean the government can pick and choose which grievances the public may air, or bar the airing of grievances altogether. *See City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp. Rel. Comm'n*, 429 U.S. 167, 175 n.8 (1976). Because the policy is not "reasonable," it is subject, like viewpoint discrimination, to strict scrutiny, *Reed*, 576 U.S. at 164, which it fails.

Surprise cannot carry the exacting burden it bears to show the Council Criticism Policy "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar v. Vincent*, 454 U.S. 263, 270 (1981); *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions"); *Reed*, 576 U.S. at 163 ("Content-based laws . . . are presumptively unconstitutional."). At the

outset, there is no compelling interest in shielding public officials from criticism. *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2407 (2024). Nor is the policy narrowly tailored because, as discussed below, it is unconstitutionally overbroad, reaching broad swaths of protected speech on matters of public concern, even when not disruptive. *See Baca*, 936 F. Supp. at 730–35 (granting preliminary injunction under strict scrutiny against a policy functionally identical to Surprise's Council Criticism Policy).

The Council Criticism Policy discriminates on the basis of viewpoint and content. It is unconstitutional twice over and should be enjoined.

**B.    The Council Criticism Policy is unconstitutionally overbroad.**

Surprise's policy further violates the First Amendment because it is unconstitutionally overbroad, reaching speech on matters of public concern even when it does not cause "actual disruption." *Norse*, 629 F.3d at 976. A regulation is unconstitutionally "overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation omitted). The overbreadth doctrine "is predicated on the danger that an overly broad [regulation], if left in place, may cause persons whose expression is constitutionally protected to refrain from exercising their rights for fear" of violating the regulation. *Massachusetts v. Oakes*, 491 U.S. 576, 581 (1989). The Council Criticism Policy embodies that danger.

The "first step" of an overbreadth analysis is to assess the "scope" of the law: "What activities, by what actors, do the laws prohibit or otherwise regulate" and then "decide which of the [rule's] applications violate the First Amendment." *Moody*, 144 S. Ct. at 2398.

The Council Criticism Policy is substantially overbroad because the First Amendment squarely protects precisely what the policy seeks to restrict: the right to criticize public officials. *Rosenblatt*, 383 U.S. at 85. And speech on matters of public concern "occupies the highest rung of the hierarchy of First Amendment values." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). To the extent Surprise's public comment rule banning "complain[ing]" about public officials has *any* legitimate applications, that theoretically lawful sliver is dwarfed by the plethora of impermissible applications.

The Council Criticism Policy prohibits citizens from saying to councilmembers "You made a bad decision" or "You are not doing what you were elected to do." It admits of no reasonable limiting construction which can cure the constitutional infirmity. Its continued existence serves only to chill residents from engaging in the full array of protected First Amendment speech before the City Council, as Schulzke's dilemma illustrates. The Court should enjoin the policy as unconstitutionally overbroad.

**C.      The Council Criticism Policy is void for vagueness.**

Surprise's policy prohibiting comments that "lodge charges or complaints" violates the First and Fourteenth Amendments for the additional and separate reason that it is unconstitutionally vague. The Council Criticism Policy is unlawfully vague because it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). The "void for vagueness doctrine addresses at least two connected but discrete due process concerns." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). First, "regulated parties

should know what is required of them so they may act accordingly," and second, "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* The Supreme Court has warned government bodies and officials that "[w]hen speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–54.

Even in a "nonpublic" forum, the government "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 16 (2018). While some discretion is permissible, it "'must be guided by objective, workable standards' to avoid the moderator's own beliefs shaping his or her 'views on what counts' as a policy violation." *Marshall v. Amuso*, 571 F. Supp. 3d 412, 424 (E.D. Pa. 2021) (quoting *Mansky*, 585 U.S. at 21–22).

In *Marshall*, the court preliminarily enjoined as void for vagueness a public comment policy prohibiting "personally directed" remarks, holding the policy provided "no evidence of objective, workable standards to guide the presiding officer's exercise of discretion." 571 F. Supp. 3d at 423–25 (quoting *Minn. Voters All.*, 585 U.S. at 21). "Allowing little more than the presiding officer's own views to shape 'what counts'" as a policy violation "openly invites viewpoint discrimination," by supplying the moderator unfettered discretion to pick and choose when to enforce the regulation. *Id.*

Surprise's prohibition on comments "complain[ing]" about public employees "regardless of whether such person is identified" in the speaker's remarks similarly "openly invites viewpoint discrimination." *Id.* When a municipality acts, it acts through its

employees and officials. As a result, a broad range of speech criticizing the city's acts, policies, or proposals can be seen as speech about employees or officials.

For example, if a resident speaks during the public comment period about a parking ticket, are they complaining about the issuing officer? If they complain about an unfixed streetlight, are they making a "complaint" about the public works employee assigned to the repair? The public works director? As in *Mansky* and *Marshall*, Surprise provides no "sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 585 U.S. at 16.

The Council Criticism Policy thus provides Schulzke and other residents no way of knowing how to structure remarks to avoid violating the policy (except, of course, to refrain from exercising their First Amendment right to say anything that might be deemed a charge or complaint against public employees or officials). And it provides no guardrails to ensure officials charged with enforcing the policy apply it evenhandedly, as Mayor Hall's actions—recorded on video—demonstrate. The policy is void for vagueness and, as in *Marshall*, this Court should enjoin its enforcement.

### III. Schulzke's Loss of First Amendment Rights is Irreparable Harm.

Having shown likely success on his claims, Schulzke is entitled to a preliminary injunction because a "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Meinecke v. City of Seattle*, 99 F. 4th 514, 526 (9th Cir. 2024).

**IV.    The Balance of Harms and Public Interest in Freedom of Expression Favor a Preliminary Injunction.**

When a plaintiff seeks a preliminary injunction against a public entity, the public interest and equity-balance factors "merge." *Nken v. Holder*, 556 U.S. 418, 435–36 (2009). The Ninth Circuit has made clear that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Meinecke*, 99 F.4th at 526 (cleaned up). So when, as here, "a party raises serious First Amendment questions, that alone compels a finding that the balance of hardships tips sharply in its favor." *Id*. (cleaned up).[8]

## CONCLUSION

The Court should grant a preliminary injunction barring the City of Surprise from continuing to enforce its ban on criticism of city employees and officials.

Dated: September 4, 2024          Respectfully submitted,

/s/ Daniel J. Quigley
Daniel J. Quigley
(State Bar No. 011052)
**DANIEL J. QUIGLEY, PLC**
5425 E. Broadway Blvd., Ste. 352
Tucson, Arizona 85711
(520) 867-4430
quigley@djqplc.com

Conor T. Fitzpatrick*
(Mich. P78981 / D.C. 90015616)
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION**
700 Pennsylvania Ave. SE, Ste. 340

---

[8] For similar reasons, the Court should waive the bond requirement, because F.R.C.P. 65 allows "discretion as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (cleaned up) (emphasis added); *see Weaver v. City of Montebello*, 370 F.Supp.3d 1130, 1139 (C.D. Cal. 2019) (waiving requirement).

—15—

Washington, D.C. 20003
(215) 717-3473
conor.fitzpatrick@thefire.org

Adam B. Steinbaugh*
(Penn. 326475 / Cal. 304829)
**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION**
510 Walnut Street, Ste. 900
Philadelphia, PA 19106
(215) 717-3473
adam@thefire.org

*Counsel for Plaintiffs*

* *Pro hac vice* application forthcoming

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and exact copy of the foregoing document has been served upon the counsel for the parties in interest by operation of the Court's electronic case filing system, and that a true and exact copy of the document will be served upon the parties with the Summons and/or Rule 4 waiver.


/s/ Daniel J. Quigley
Daniel J. Quigley